## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| BELINDA HOUSEY, on behalf of herself and all others similarly situated, | Case No. |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| PROCTER & GAMBLE COMPANY, | |
| Defendants. | |

Plaintiff Belinda Housey ("Plaintiff") brings this Class Action against Procter & Gamble Company ("P&G" or "Defendant"), on behalf of herself and all others similarly situated, and alleges the following based on her personal knowledge and the investigation of her counsel:

### INTRODUCTION

1.      This is a consumer Class Action against Procter & Gamble Company for its false advertising, unfair and deceptive marketing practices, and materially misleading claims and omissions they employed and disseminated in connection with the sale of its line of Crest® toothpastes containing charcoal.

2.      Charcoal is highly porous and has adsorptive qualities that can be useful in certain contexts. In recent years, health and beauty products containing activated charcoal have become a consumer sensation. Opportunistic marketers, celebrities and social media influencers tout a variety of certain charcoal products for purported detoxifying properties and other enhanced wellbeing and health benefits. Consumers have been willing to pay a premium for these charcoal products based on these purported benefits.

3.      P&G sells oral care products containing charcoal, including: "Crest® 3D White

Whitening Therapy – Charcoal with Hemp Seed Oil"; "Crest® Gum Detoxify Charcoal Toothpaste"; "Crest® 3D White Whitening Toothpaste with Charcoal" (collectively, "Charcoal Toothpastes.")

4.    P& G actively misleads consumers to believe the Charcoal Toothpastes are enamel-safe whitening toothpastes that gently clean, and that can promote healthier gums.

5.    P&G promotes the Charcoal Toothpastes with multiple claims printed on the product packaging and tube labels of the Charcoal Toothpastes, specifically including that the Charcoal Toothpastes have "enamel safe whitening" capabilities, that they promote "healthy gums", and they can "gently clean."

6.    Indeed, P&G was well aware that it had duties to uphold as to its marketing, advertising and labeling of the Charcoal Toothpastes. This is in part evidenced by the fact that the Charcoal Toothpastes it develops, markets, and sells are all subject to a legal and regulatory framework over cosmetics and over-the-counter drugs.[1]

7.    P&G's marketing strategy has been very successful, and the Charcoal Toothpastes have become one of the top sellers in its product category. However, that success is built around messaging that is materially misleading and deceptive to consumers, lacks a factual basis, and recklessly omits material information concerning the use of charcoal in oral care.

8.    The consensus of respected dentists, researchers and industry experts weighs *against* the use of charcoal dentifrices, due to the lack of scientific substantiation on safety and efficacy, as well as risks of harm.

9.    Notably, the American Dental Association ("ADA") has not approved *any*

---

[1] Each of the Charcoal Toothpastes qualify as a cosmetic or a combination of cosmetic and over-the-counter drug, under the pertinent legal framework, as explained *infra*.

charcoal dentifrices for its ADA Seal of Acceptance (the "ADA Seal"). The ADA Seal certifies the safety and efficacy of a dentifrice, based on clinical data and research.

10.     P&G knew or should have known that its claims regarding the Charcoal Toothpastes were misleading, deceptive, and/or false and lacked a reasonable basis or credible substantiation.

11.     P&G also omitted material facts, including that charcoal, when used in toothpastes, is known to be abrasive to enamel and the gums, and to pose risky safety hazards with use.

12.     As a result of P&G's marketing claims and messaging, Plaintiff and other consumers reasonably and justifiably relied upon and attributed credence and value to the asserted benefits, specifically the safety and efficacy in their "healthy gum" contribution claims and "enamel safe whitening", "gentl[e] clean[ing]" properties of the Charcoal Toothpastes.

13.     As a direct and proximate result of P&G's misrepresentations, material omissions and deceptive practices in its advertising and labeling, Plaintiff and others similarly situated have suffered actual injuries from their purchase of one or more of the Charcoal Toothpastes, and did not receive the full value of their purchase. P&G successfully induced Plaintiff and the putative class members to purchase the Charcoal Toothpastes that cannot effectively promote "healthier gums", "gently clean", or have "enamel safe whitening" functions as represented by P&G.

14.     Additionally, P&G charges a price premium for the Charcoal Toothpastes over other toothpastes that do not contain charcoal, including its own non-charcoal toothpastes.

15.     By falsely advertising and misbranding its Charcoal Toothpastes, P&G prioritizes its own profits and jeopardizes consumers' dental hygiene, oral health and safety.

P&G's conduct in its advertising, labeling, and sale of the Charcoal Toothpastes was, and continues to, be substantially injurious to consumers, as well as unconscionable and in contravention of public policy.

16.     P&G's false advertising and labeling and materially misleading claims and omissions have enabled it to sell the Charcoal Toothpastes in great quantity.

17.     Defendant's conduct is consumer-oriented and likely to deceive reasonable consumers, and is in violation of New York consumer laws and constitutes unlawful practices in violation of Sections 349 and 350 of New York General Business Laws well as violations of common law. Defendant was unjustly enriched as result of its misconduct.

18.     Plaintiff brings this proposed Class Action on behalf of herself and other similarly situated consumers throughout the nation, including New York, who purchased P&G's Charcoal Toothpastes within the relevant statute(s) of limitations period (the "Class"). For the alleged violations of state statutory law and common law, Plaintiff seeks on behalf of herself and the members of the Class, to recover compensatory and statutory damages, treble or punitive damages as available, attorneys' fees and costs, as well as declaratory and injunctive relief.

## JURISDICTION AND VENUE

19.     This Court has jurisdiction over this matter under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d), as the amount in controversy exceeds $5 million, exclusive of interests and costs; it is a class action of over 100 members; and the Plaintiff is a citizen of a state different from at least one Defendant.

20.     This Court has personal jurisdiction over Defendant. Defendant has sufficient minimum contacts with the state of New York and purposefully availed itself, and continues to

avail itself, of the jurisdiction of this New York through the privilege of conducting its business ventures in the state of New York, thus rendering the exercise of jurisdiction by the Court permissible under traditional notions of fair play and substantial justice.

21.     Venue is proper in this district under 28 U.S.C. § 1391(a) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this district, as Defendant does business throughout this district, and Plaintiff Housey made her purchase of the Charcoal Toothpaste in this district and her purchased product was delivered to, and used, in this district.

## PARTIES

22.     Plaintiff Belinda Housey ("Plaintiff Housey" or "Ms. Housey") is a natural person and a citizen of New York, residing in New York City. Plaintiff Housey purchased the Crest® 3D White Whitening Toothpaste with Charcoal. Prior to her purchase, Ms. Housey saw and reviewed Defendant's advertising claims on the toothpaste packaging and labeling itself, and she made her purchase of the toothpaste in reliance thereon. Ms. Housey specifically relied upon representations made by Defendant that the toothpaste was safe to use for brushing her teeth and that the toothpaste had enamel safe whitening properties. Ms. Housey did not receive the promised benefits or safety, or receive the full value of her purchase.

23.     Defendant P&G is an Ohio corporation with its principal place of business at 1 P&G Plaza, Cincinnati, OH 45202. P&G is licensed with the New York Department of State to conduct business in New York. Defendant is an American multinational consumer goods corporation. The company reported annual revenue of more than $73 billion in 2020[2].

24.     Plaintiff reserves the right to amend this Complaint to add different or

---

[2] *Procter & Gamble Company Profile*, Fortune, https://fortune.com/company/procter-gamble/fortune500/ (last visited March 15, 2021).

additional defendants, including without limitation any officer, director, employee, supplier, or distributor of Defendant who has knowingly and willfully aided, abetted, or conspired in the false and deceptive conduct alleged herein.

## COMMON FACTUAL ALLEGATIONS

### A.    Charcoal Historically Has Many Uses, But Not All Are Effective or Safe.

25.    Charcoal has adsorptive qualities that have proven to be quite useful in certain limited contexts. For decades, it has been used in the emergency medical treatment of certain types of poisonings and drug overdoses, because, when administered correctly, it can adsorb certain heavy metals, drugs and other toxins.[3] The effectiveness of medicinal activated charcoal in the emergency room setting is limited and dependent on specific factors, such as the type of drug, poison, or toxin, timing between ingestion of the toxin and ingestion of the medicinal charcoal, and dosage of each.[4]

26.    Charcoal has also been used in industrial and environmental settings to extract certain organic and in organic substances from water.[5] For example, it is sometimes used to remove excess amounts of fluoride from drinking water.[6] It is used in juice manufacturing to

---

[3] *See generally*, Robert W. Derlet & Timothy E. Albertson, "Activated Charcoal—Past, Present and Future," 145 *West J. Med.* 493 (Oct. 1986) [https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1306980/pdf/westjmed00158-0063.pdf]. (last accessed March 15, 2021).
[4] *Id.*; *see also* Derlet & Alberston, *supra* note 3, at 493–92 & Table 1; Jennifer A. Lowry, "Use of Activated Charcoal in Pediatric Populations," World Health Organization: Subcommittee of Expert Committee on the Selection and Use of Essential Medicines, Jan. 2008, at 2, [https://www.who.int/selection_medicines/committees/subcommittee/2/charcoal_rev.pdf ] (reviewing literature on medical use of activated charcoal). (last accessed March 15, 2021).
[5] *See generally* "The History of Activated Carbon," Jurassic Activated Carbon, Feb. 9, 2014 [https://www.jurassiccarbon.com/blogs/news/12186281-the-history-of-activated-carbon]. (last accessed March 15, 2021).
[6] Manisha Poudyal & Sandhya Babel, "Removal of Fluoride using Granular Activated Carbon and Domestic Sewage Sludge," 82 *Int'l Proceedings of Chem., Biological, and Envtl. Eng'g* 139 (2015) [http://www.ipcbee.com/vol82/027-IEEA2015-C3024.pdf]; *see also* Behrooz Eftekhar et al., "The Effectiveness of Home Water Purification Systems on the Amount of Fluoride in Drinking Water," *J. of Dentistry, Shiraz U. of Med. Sci.*, Sept. 2015, at 278, (noting that use of home water purification systems, including several using carbon-based filtration methods, reduced the amount of fluoride in water). (last accessed March 15, 2021).

control color and remove organic compounds.[7] Activated charcoal can also adsorb water-soluble vitamins, including forms of Vitamins C and B.[8]

27.    Charcoal was also used in ancient times for human health purposes. The first use of charcoal for oral hygiene dates back to Hippocrates in ancient Greece.[9] The Romans apparently followed this practice, along with other questionable oral care practices such as rinsing their mouths with urine.[10]

28.    In the modern age, inspired by the use of activated charcoal in these limited and particular contexts, enterprising companies like Defendants have been eager to extrapolate charcoal's adsorptive properties for use in a much broader context, often with little to no substantiation. Products containing activated charcoal are increasingly prevalent and are promoted with false, deceptive, or overstated health and beauty benefits. Activated charcoal has been marketed to the public as capable of extracting nearly any undesirable element or substance, and in nearly any context.

29.    Multiple scientific and consumer publications have made note of the misleading health and safety benefits of charcoal (particularly in its most commonly available form as an ingestible supplement). Notable excerpts include:

- "In recent years, people have tried to translate the very limited success of activated charcoal in the ER to their everyday lives, assuming that if it can

---

[7] Cetin Kadakal et al., "Research Note: Effect of Activated Charcoal on Water-Soluble Vitamin Content of Apple Juice," 27 *J. of Food Quality* 171 (Apr. 2004) [https://doi.org/10.1111/j.1745-4557.2004.tb00647.x]. (last accessed March 15, 2021).
[8] *Id*.
[9] *See* S.W.B. Newsom, "Hygiene and the Ancient Romans," *J. of Infection Prevention*, at 25, June 2004 [https://journals.sagepub.com/doi/abs/10.1177/14690446040050030601]. (last accessed March 15, 2021).
[10] C. Valerius Catullus, "On Egnatius of the White Teeth," circa B.C. 84–54, (Tr. Richard Francis Burton, 1894), [http://www.perseus.tufts.edu/hopper/text?doc=Perseus:text:1999.02.0005:poem%3D39] (poem by the Roman poet Catullus referring to the practice of whitening teeth by rinsing with urine). (last accessed March 15, 2021).

adhere to and remove certain drugs in an emergency room, it can stop all kinds of toxins, making an already healthy person even healthier."[11]

- Lisa Sasson, M.S., R.D., clinical associate professor of nutrition at New York University is quoted as saying "**this logical leap is not based in science**."[12]

30.     Simultaneous with the charcoal trend, consumer demand for teeth-whitening products has risen. The global market for teeth-whitening products is expected to reach $7.4 billion by 2024.[13]

31.     P&G has successfully leveraged the charcoal trends as well as consumer enthusiasm for teeth whitening with its development, marketing, and sales of its Charcoal Toothpastes, stating in plain language on their packaging just below the "Charcoal" denotation of the toothpaste: "A formula to activate a whiter smile."

**B.     Activated Charcoal is Unsafe By Modern Scientific and Regulatory Standards.**

**1.     Contemporary studies challenge the safety and efficacy of activated charcoal for use in dentifrice.**

32.     In the United States, there have been several attempts to introduce charcoal as an oral health product. According to commentary published in the Journal of the American Dental Association ("JADA") in 1932, a product named "Kramer's Original Charcoal Dental Cream," had been pronounced "not acceptable" as an Accepted Dental Remedies (ADR) by the Council on Dental Therapeutics (the "Council"). The Council found that "[c]linical experiences

---

[11] Julia Calderone, "Activated Charcoal Isn't a Magic Health Bullet," Consumer Reports (April 13, 2017) [https://consumerreports.org/dietary-supplements/activated-charcoal-fad-not-a-magic-health-bullet/]. (last accessed March 15, 2021).
[12] *Id.*
[13] https://www.hexaresearch.com/research-report/teeth-whitening-products-market.

are recorded in which the particles of charcoal became imbedded in the gum tissue and produced a bluish line near the margin, which is removable only by surgical means."[14] When the Kramer's brand produced no evidence to rebut the clinical results, the Council denied it as an ADR "because it is a dentifrice intended for daily use that contains **charcoal, a potentially harmful substance**."[15]

33.     Decades after American dentistry rejected charcoal for use in dentifrice, the topic has again resurfaced, in light of the burgeoning consumer trend. One study, presented at the Academy of General Dentistry 2015 Annual Meeting, concluded that "activated charcoal was more abrasive than a whitening toothpaste on acrylic resins" and warned that "[t]he fine black charcoal powder may become embedded in defects such as margins or cracks present on older dentition."[16]

34.     In 2017, the Journal of the American Dental Association published a literature review to "examine the efficacy and safety of charcoal and charcoal-based dentifrices." John K. Brooks et al., *Charcoal and Charcoal-Based Dentifrices*, 148 JADA 661 (2017) (referred to herein as "*Charcoal-Based Dentifrices* (JADA 2017)" or "the 2017 JADA article"). The authors, Dr. John Brooks, DDS, Dr. Nasir Bashirelahi, PhD, and Dr. Mark A. Reynolds, DDS, PhD, reviewed the first 50 consecutive charcoal dentifrices from Google.com and Amazon.com to assess how the marketing claims of these products compared with efficacy and safety of charcoal-based dentifrices as found in the available scientific literature.[17]

---

[14] John K. Brooks et al., "Commentaries: More on Charcoal and Charcoal-Based Dentifrices," 148 JADA 785 (2017), [http://dx.doi.org/10.1016/j.adaj.2017.09.027] (quoting S.M. Gordan, "Kramer's Original Charcoal Dental Cream: not acceptable for A.D.R.," 33 *JADA* 912, 912–13 (1946)).
[15] *Id.* (emphasis added).
[16] Brantley McCarty et al., "Activated Charcoal as a Whitening Dentifrice," Presented at Academy of General Dentistry 2015 Annual Meeting, June 18–21, 2015, San Francisco, CA [https://www.epostersonline.com/agd2015/node/72] (last accessed March 15, 2021).
[17] John K. Brooks et al., "Charcoal and Charcoal-Based Dentifrices," 148 *JADA* 661 (2017).

35.     The findings of the 2017 JADA article state that there is no scientific support for a "detoxifying" effect of charcoal[18]; it is abrasive on teeth and gingiva[19]; and any inclusion of fluoride for health is counteracted and rendered moot by the inclusion of charcoal[20].

36.     In short, there was little evidence that charcoal-based toothpastes offered any cosmetic or health benefits and were as safe as marketers touted.[21]

37.     A later publication in May 2019 in the British Dental Journal confirmed that supporting scientific evidence remained lacking, and again raised the same and similar concerns reflected in the 2017 JADA article. Linda H. Greenwall et al., *Charcoal-Containing Dentifrices*, 226 BDJ 697, 698 (2019) (referred to herein as "*Charcoal-Containing Dentifrices* (BDJ 2019)" or "the 2019 BDJ article").

38.     The 2019 BDJ article considered charcoal dentifrices to be a "gimmick"[22] and said that marketing of such products was "worrying." [23]

39.     The conclusions of the 2019 BDJ article about dentifrices containing charcoal mass marketed to the public are neatly summed up by the following:

> "[T]he ethics of such an approach to the marketing of health-influencing products is at best questionable. False and deceptive messaging, together with the selective provision of information could be classed as misleading practice, contrary to the consumers' best interests and protection."[24]

**2.     The American Dental Association has Not Approved any Activated Charcoal Dentifrice for its ADA Seal of Acceptance.**

---

[18] *Id.* (emphasis added). The authors were unable to identify any randomized, controlled clinical trials with a follow-up duration of 3 months or longer testing the safety or effectiveness of charcoal-based dentifrices. All of the available studies lacked adequate controls to measure clinical oral improvements with charcoal-based dentifrices.
[19] *Id.* (emphasis added).
[20] *Id.* (emphasis added).
[21] *Id.* (emphasis added).
[22] Linda H. Greenwall *et al.*, "Charcoal-Containing Dentifrices," 226 *British Dental Journal* 697, 698 (2019).
[23] *Id.*
[24] *Id.* (emphasis added).

40.     The American Dental Association ("ADA") was founded in 1859.[25] Per the ADA's description of its mission, the ADA "exists to power the profession of dentistry and to assist our members in advancing the overall oral health of their patients."[26] ADA presents itself as a "strong advocate[] for public health" working with an aim to keep patients "healthy from the dental chair to daily care at home." [27]

41.     In furtherance of the ADA's public health goals, the organization administers the ADA Seal of Acceptance Program ("Seal Program"), which began in 1931.[28] The ADA established its Seal Program to combat "extravagant claims" about what dental products could do.[29] Since that time, the ADA Seal of Acceptance has become "[u]niversally recognized by consumers as a symbol of safety and effectiveness" and "is carried on more than 300 oral health products, including toothpastes, toothbrushes, dental floss, mouth rinses, denture adherents, and chewing gum."[30]

42.     Significantly, the ADA has not granted the ADA Seal of Acceptance to any product with activated charcoal, including the Charcoal Toothpastes.[31]

43.     However, P&G *has* received the ADA Seal of Acceptance for other oral care products it has developed, marketed and sold to consumers, including the following products: "Crest® 3D White Whitestrips (various flavors)"; "Crest® 3D Whitestrips Classic Vivid"; "Crest® 3D Whitestrips Gentle (various flavors)"; "Crest® Gum & Breath Purify (various)"; "Crest® Pro-Health Active Defense (Deep Clean)"; "Crest® Cavity Protection Cool Mint Gel

---

[25] https://www.ada.org/en/about-the-ada/ada-history-and-presidents-of-the-ada (last accessed March 16, 2021).
[26] https://www.ada.org/en/about-the-ada (last accessed March 16, 2021).
[27] *Id.*
[28] https://www.ada.org/en/science-research/ada-seal-of-acceptance (last accessed March 16, 2021).
[29] https://www.ada.org/en/science-research/ada-seal-of-acceptance/ada-seal-faq, "What is the ADA Seal?" (last accessed March 16, 2021).
[30] https://www.ada.org/en/about-the-ada (last accessed March 16, 2021).
[31] *See* https://www.ada.org/en/science-research/ada-seal-of-acceptance/ada-seal-shopping-list (last accessed March 21, 2021).

& Paste"; "Crest® Kids SparkleFun Cavity Protection"; "Crest® Pure (various)"; "Crest®
Pure Kids (Tropical Strawberry)"; "Crest ® Tartar Protection Fresh Mint Gel & Paste";
"Crest® Gum & Enamel Repair (various)"; "Crest® Gum & Sensitivity (various)"; "Crest®
Gum Detoxify (various)"; "Crest® Pro-Health Advanced Deep Clean Mint Toothpaste"; and
"Crest® Pro-Health Toothpaste (various)."[32]

44.   Based upon the prevailing scientific literature regarding the lack of
substantiation on safety and efficacy of activated charcoal in dental products, and the known
risks and abrasiveness of charcoal, coupled with P&G's prior experience with the ADA Seal
Program, P&G was or should have been aware of the unsuitability of the ADA Seal of
Acceptance for its Charcoal Toothpastes. Nevertheless, it has chosen to make the exact sort of
false, deceptive, and/or misleading claims that inspired the creation of the ADA's Seal
Program.

**C.   P&G Knowingly Misleads Consumers with Misrepresentations Concerning Safety
and Efficacy in its Charcoal Toothpastes.**

**1.   P&G's Representations on the Charcoal Toothpastes' Labeling, Packaging,
Advertising, and Marketing.**

45.   Since at least 2019, P&G has packaged, marketed, distributed, and sold some or
all of its P&G Charcoal Toothpastes. Examples of the external cardboard boxes, product
packaging and tubes include:

---

[32] https://www.ada.org/en/science-research/ada-seal-of-acceptance/ada-seal-shopping-list (last accessed March 15,
2021).







46.     The above packaging bears representations right on the Charcoal Toothpastes'

front label such as "enamel safe whitening", "gentle clean", and "healthier gums."

47.     On its website, P&G makes the following claims regarding both toothpastes, as

well as the purpose and benefits of activated charcoal in its oral care products:

"Brighten your smile with Crest 3D White Charcoal Whitening Toothpaste… it also

strengthens your tooth enamel…"[33]

"Crest 3D White Whitening Therapy Gentle Clean black Charcoal Toothpaste gently whitens teeth by removing surface stains…"[34]

"Crest Pro-Health and Sensitivity Charcoal toothpaste is clinically proven to promote healthier gums…"[35]

**2.    The Claimed Benefits of the Charcoal Toothpastes are Materially Misleading and are Debunked or Unsubstantiated by Scientific Evidence, Impossible, and/or Untrue.**

**(i)    *P&G's Charcoal Toothpastes are Mislabeled Because They Are Not Safe for Enamel or Gums***

48.    While proclaiming that the Charcoal Toothpastes are able to promote healthier gums, and are safe and gentle for tooth enamel, P&G also fails to disclose material facts, such that activated charcoal has *not* been substantiated as safe and effective for use in dentifrice, and both JADA and the BDJ have confirmed insufficient scientific evidence to substantiate safety claims (as well as cosmetic and health benefits) as well as raised concerns about risks associated with the use of charcoal dentifrices.

49.    Activated charcoal is known to be a highly abrasive and harmful substance to tooth enamel.[36] Multiple scientific studies have noted its abrasiveness presents a risk to enamel and gingiva in the context of oral care products. As noted in the 2017 JADA article: "[c]harcoal has been recognized as an abrasive mineral to the teeth and gingiva, and its inclusion in tooth

---

[33] https://crest.com/en-us/products/toothpaste/crest-3d-white-whitening-toothpaste-charcoal (last accessed March 15, 2021)

[34] https://crest.com/en-us/products/toothpaste/crest-3d-white-whitening-therapy-toothpaste-hemp-seed-oil (last accessed March 16, 2021)

[35] https://crest.com/en-us/products/toothpaste/crest-gum-detoxify-charcoal-toothpaste (last accessed March 16, 2021)

[36] *See, e.g.*, John K. Brooks et al., "Commentaries: More on Charcoal and Charcoal-Based Dentifrices," 148 *JADA* 785 (2017) [http://dx.doi.org/10.1016/j.adaj.2017.09.027] (quoting S.M. Gordan, "Kramer's Original Charcoal Dental Cream: not acceptable for A.D.R.," 33 *JADA* 912, 912–13 (1946)) (Concluding a charcoal dental cream was not an acceptable dental remedy "because it is a dentifrice intended for daily use that contains charcoal, a potentially harmful substance").

preparations raises concern about damages to these oral structures, as well as increasing caries susceptibility due to the potential loss of enamel."[37] The 2019 BDJ article again noted the risk to enamel and gingiva posed by charcoal's abrasiveness.[38]

50.      Moreover, the abrasive damage to tooth enamel caused by charcoal can set the stage for spiraling into additional oral health issues. It has been shown that increased surface roughness of teeth creates an environment conducive to increased bacteria in the oral cavity. This, in turn, can lead to other problems and is correlated with high caries and periodontal disease.

**D.      P&G Knew or Should Have Known its Material Claims and Omissions on Oral Hygiene Benefits and Safety were Misleading, Deceptive and/or False.**

77.      P&G Charcoal Toothpastes are subject to a federal legal and regulatory framework concerning the marketing, advertising, branding, and labeling of drugs and cosmetics. (Toothpastes and other dentifrices are classified as cosmetics, drugs, or a combination thereof.). As a purveyor of regulated oral care products, making various claims as to safety, oral health, cosmetic effects, and even some medicinal and disease-prevention claims, P&G knew or should have known of its duties under such regulations. Indeed, as previously discussed, P&G has undergone the rigorous process to obtain an ADA Seal on some of its products (but has not done so for any of its charcoal products). Many of P&G's misleading and deceptive practices as to the Charcoal Toothpastes were prohibited by federal and state regulations, of which P&G was certainly aware.

78.      The Federal Trade Commission Act (15 U.S.C. § 41 *et seq.*) ("FTC Act"), as well as the Federal Food, Drug and Cosmetic Act (21 U.S.C. §321 *et seq.*) ("FD&C Act"), the

---

[37] John K. Brooks et al., "Charcoal and Charcoal-Based Dentifrices," 148 *JADA* 661 (2017).
[38] Linda H. Greenwall et al., "Charcoal-Containing Dentifrices," 226 *British Dental Journal* 697, (2019).

Fair Packaging and Labeling Act (15 U.S.C. §1451 *et seq.*) ("FP&L Act") and the regulatory framework and rules created thereunder impose obligations on marketers and distributors such as P&G. These federal laws were created in the aim to protect consumers from unfair and deceptive practices (including unsafe or deceptively labeled or packaged products), as well as to protect against unfair competition. Similarly, multiple state laws have statutes that incorporate and/or mirror pertinent portions of federal regulatory framework.

79.     In this pleading, Plaintiff acknowledges P&G's obligations and duties under this federal framework and under parallel state frameworks for purposes related to the elements of the common law and state statutory causes of action asserted herein (such as the existence of various legal duties and obligatory standards of care, the existence of a special relationship, as well as to underscore that P&G's knew or should have known of its noncompliance and that its conduct was wrongful). Plaintiff expressly disclaims any attempt to hold P&G to a higher standard than that which is required under federal law, and does not seek relief or remedy for conduct to a standard exceeding that which is required under federal law.[39]

80.     Defendant P&G was, or should have been, aware of its obligations under the above- described legal and regulatory framework; yet, P&G appears to have disregarded its duties as to claim substantiation, safety, marketing and advertising, as well as to product packaging and labeling. This further underscores that it knew or should have known its acts and practices were also unlawful under state consumer protection laws.

---

[39] The allegations concerning conduct that violates the FD&C Act, the FTC Act, regulations thereunder, and/or other parallel state laws and regulations, as raised herein, are properly asserted in the context of the causes of action and relief sought herein and are not barred by preemption. *See, e.g., Reid v. GMC Skin Care USA Inc.,* No. 15-CV-277, 2016 WL 403497, *10 (N.D.N.Y. Jan. 15, 2016) ("Plaintiffs' claims, if proven to be true, would simply require Defendant to truthfully state the efficacy of its products or not sell its products; such relief would not impose a state requirement that is different from or in addition to, or that is otherwise not identical with that of the FDCA.").

81.     Defendant P&G also knew, or should have known, that the Charcoal Toothpastes did not possess the promised benefits and safety, and that there was risk of harm. Scientific studies and journals that contradicted many of P&G's claims were published and available to P&G at the time it disseminated its claims and marketing content.

82.     Moreover, P&G would not have even had to look to academic or scientific resources, because the scientific findings were also reported in consumer reports and mainstream media outlets both before and during the time the Charcoal Toothpastes were developed, marketed and sold. Examples include:

- ABC News, June 2017, *How Safe is Activated Charcoal?* reports concerns of Dr. Upen Patel, D.D.S., because charcoal dentifrices are not evaluated by the ADA for long term use, can erode enamel, abrasiveness, gums, and tissue, and the small charcoal particles "can get stuck in your gums and in small cracks in your teeth, so you can have these little black lines in your gums and your teeth you can't get out."[40]

- BBC, May 2019, *Charcoal Toothpastes 'don't whiten teeth,'* cited the British Dental Journal for the premise that "charcoal-based toothpastes, which claim to whiten teeth, are a 'marketing gimmick' which could increase the risk of tooth decay," and are "more abrasive than regular toothpastes, potentially posing a risk to the enamel and gums." The article quoted Dr. Greenwall-Cohen as stating that charcoal particles in toothpastes can "get caught up in the gums and irritate them," and also be problematic for fillings.[41]

- Harper's Bazaar, August 2018, *Is Charcoal Toothpaste Safe to Use*? (re-published in September 2020), reported on the doubts and issues raised by the British Dental Journal, noting, "[u]nlike your liver and kidneys, the teeth and gums don't perform a detoxifying function of the body, and since so-called toxins aren't generally hanging out in your mouth anyway, there's not much point in using your tooth cleaning to purge them."[42]

- Dr. Ada Cooper, DDS, spokesperson for the American Dental Association, warned of charcoal toothpastes in *Beware Whitening Promise of Charcoal Toothpastes* in March 2019: "Just because something is popular doesn't mean it's safe." "Charcoal is recognized as an abrasive material to teeth and gums." "Using materials that are too

---

[40] Irene Cruz, "How Safe Is Activated Charcoal?," ABC 10 (June 9, 2017) [https://www.abc10.com/article/news/local/how-safe-is-activated-charcoal/447456019].

[41] "Charcoal Toothpastes 'don't whiten teeth,'" BBC: Health, May 10, 2019 [https://www.bbc.com/news/health-48216116].

[42] Lauren Hubbard & Alexandra Tunell, "Is Charcoal Toothpaste Safe to Use?," Harper's Bazaar, Aug. 14, 2018 (updated: Harper's Bazaar Staff, "Is Charcoal Toothpaste Safe to Use?," September 23, 2020) [https://www.harpersbazaar.com/beauty/health/advice/a3764/charcoal-toothpaste-pros-cons/].

abrasive can actually make your teeth look more yellow, because it can wear away the tooth's enamel and expose the softer, yellower layer called dentin."[43]

83.     It is entirely implausible that Defendant P&G, a major consumer goods company that possessed particularly sophisticated marketing savvy and invested significant time, money and effort into the marketing of its products, failed to notice reported concerns from the ADA and other dental professionals and experts, researchers within the scientific community, and the media that the safety and efficacy of charcoal dentifrices were wholly unsubstantiated, and their use was highly risky to consumers' oral health and dental hygiene. (Unlike consumers, whose attention to the claims of the oral care industry will likely be limited to time in a shopping aisle looking at product packaging, or at online retail sites that present a company's marketing claims.)

84.     Indeed, P&G was under a continuing duty to warn if its product poses a risk, and its duty could be triggered by new information.

**E.     P&G Intended Consumers' Reliance and Induced Consumers' Purchase of the Charcoal Toothpastes.**

85.     P&G's advertising and marketing scheme was constructed in order to induce consumers, including Plaintiff, to purchase the Charcoal Toothpastes over other products, and to do so at a price premium.

86.     The claims at issue – which are alleged herein as misleading, inaccurate, and/or false, as well as lacking a proper factual basis and required evidentiary substantiation – are material to a consumer's decision whether to purchase them. P&G recklessly and/or intentionally fails to disclose material information that, if known to a consumer, would inform their perception of the claims affirmatively made, and would affect the purchase decision. The

---

[43] The Family Dental Center, Mar. 2019, "Beware Whitening Promise of Charcoal Toothpastes," [https://thefamilydentalcenter.com/blog/beware-whitening-promise-of-charcoal-toothpastes/].

misrepresentations and omissions also have potentially serious consequences on consumers' oral health and dental hygiene, simply as a result of the intended use.

87.     P&G made many claims relating to health, safety and overall oral health, which it knew average consumers were unequipped to assess, and were relying on and placing their trust in.

88.     P&G charges more for its Charcoal Toothpastes than it does for P&G's other non-charcoal toothpastes. Through third-party retailers, P&G charges approximately $4.19 per 5.4-ounce tube of non-charcoal toothpaste. The Charcoal Toothpastes are sold at $4.99-$7.28 per 4.1-ounce tube.[44] This represents a substantial price premium.

89.     P&G continues to promote and hype the (unsubstantiated) attributes of activated charcoal. It does so despite warnings from dentists and the scientific community about charcoal dentifrices – at best a "marketing gimmick" and, at worst, harmful to teeth, dentistry implants and overall oral health.

90.     P&G's misleading claims, material omissions, and its false and deceptive marketing campaign as a whole, are materially misleading and likely to deceive (and have deceived) consumers, and are intended to induce reliance and the purchase of one or more of the Charcoal Toothpastes.

**F.     Consumers' Reliance on P&G's Misrepresentations was Reasonable and Justified.**

91.     Each and every purchaser of the P&G's Charcoal Toothpastes, including Plaintiff Housey and putative Class members, were exposed to Defendant's claims. In addition

---

[44] See https://crest.com/en-us/products/toothpaste/crest-gum-detoxify-charcoal-toothpaste (Crest® Gum Detoxify Charcoal Toothpaste); https://www.target.com/p/crest-3d-white-charcoal-whitening-toothpaste-4-1oz-160/-/A-76198351#lnk=sametab (Crest® 3D White Whitening Toothpaste with Charcoal); https://www.walmart.com/ip/Crest-3D-White-Whitening-Therapy-Charcoal-Fluoride-Toothpaste-Hemp-Seed-Oil-Mint-4-1-oz/116904826 (Crest® 3D White Whitening Therapy – Charcoal with Hemp Seed Oil); and https://www.cvs.com/shop/crest-scope-outlast-complete-whitening-toothpaste-mint-prodid-1011341 (Crest + Scope Outlast Complete Whitening Toothpaste, Mint).

to online and print marketing and ads, the claims are printed on external cardboard packaging and product labeling – directly on the Charcoal Toothpastes' front label.

92.     Consumers reasonably relied on the oft-repeated claims that the Charcoal Toothpastes had enamel-safe whitening properties, promoted healthier gums, and could gently clean, as well as other dental hygiene and cosmetic benefits; that they were generally effective, appropriate, and adequate for dental hygiene maintenance; and, at least not harmful in their intended use.

93.     Plaintiff, putative Class members, and consumers at large have been harmed by P&G's false, misleading and deceptive representations because they purchased the P&G Charcoal Toothpastes that were not as represented, in that they did not provide the promised benefits, properties, and characteristics, as well as a level of safety. They were also ineffective as dentifrice and/or harmful.

94.     Plaintiff and purported class members paid a premium price for the mislabeled and falsely advertised products, and such premium can be directly and clearly tied to the inclusion of the activated charcoal ingredient, and the hyped marketing claims P&G made about its attributes. The premium would not have been paid but-for P&G's misrepresentations on the unproven and harmful ingredient – charcoal.[45]

95.     In addition to the economic injury in the form of a price premium paid for falsely promised benefits, consumers have been damaged by the total purchase price, because they purchased a dentifrice that does not provide the basic safety and oral health maintenance that otherwise similar non-charcoal dentifrices do.

---

[45] Each consumer has been exposed to the same or substantially similar misleading and unlawful practices and each product contains identical or substantially similar claims, and each of the Charcoal Toothpastes were sold at a price premium. As such, each consumer suffered the same or substantially similar injuries as Plaintiff, irrespective of which particular Charcoal Toothpaste they purchased.

96.     Consumers were damaged by the entire cost of a tube of toothpaste that was ineffective at maintenance of oral hygiene and potentially deleterious to oral health. In addition to its trusting consumers, P&G took unfair advantage of its competitors. It conveyed that the Charcoal Toothpastes were of such premium, superior quality and had attributes that other commercially available toothpastes do not.

97.     P&G has collected substantial profits as a result of numerous material omissions and false and misleading claims over the benefits and safety of activated charcoal in dentifrices and the Charcoal Toothpastes, and other purported attributes that were false and misleading.

98.     Defendant should not be permitted to retain their substantial benefit obtained from their injurious misconduct, which in justice and equity belong to Plaintiff and members of the Class, and caused them injury; nor should Defendant, in justice and equity, be permitted to continue to benefit from its unfair and deceptive practices.

99.     Without remedy (including injunctive relief), Plaintiff, members of the putative Class, and other consumers, will suffer a concrete harm, in that they cannot be confident that the labeling of products will be truthful and not misleading when they are making their purchase decisions in the future. Alternatively, they might mistakenly but reasonably believe that the labeling and advertising of the products has been substantiated and/or corrected, and be deceived yet again into purchasing one or more of the products.

100.     Indeed, Plaintiff would continue to purchase the Charcoal Toothpastes in the future if the misleading labeling is corrected or the manner in which the Charcoal Toothpastes are manufactured is changed. Indeed, Plaintiff wishes to be able to continue purchasing Defendant's Charcoal Toothpastes, and thus wishes to see the Charcoal Toothpastes truthfully advertised.  Moreover, Plaintiff is aware that proposed Class Members are currently purchasing,

and will continue to purchase, the Charcoal Toothpastes, unaware that Defendant's front label

claims are false and deceptive, unless Defendant's conduct is enjoined.

## G.     Plaintiff Relied Upon the Charcoal Toothpastes' Labels to Purchase and Use the Charcoal Toothpastes.

101.    Ms. Housey relied on the marketing and packaging that represented activated

charcoal as having unique properties that added a special value, and she would not have

purchased the Charcoal Toothpaste but-for the fact that it contained charcoal, the inclusion and

purported benefits for which she paid a price premium.

102.    Ms. Housey expected that the Charcoal Toothpaste would meet P&G's own

representations (made on the product itself and online), including but not limited to that it would

safely whiten teeth, promote healthier gums, gently clean, that it would be safe for everyday use

and overall oral health.

103.    She chose the Charcoal Toothpaste because of P&G's particular emphasis on

safe ingredients and reputation for quality consumer goods and oral care. She expected that the

Charcoal Toothpaste would safely meet dental hygiene and oral health care needs.

104.    However, after a period of use, Ms. Housey's expectations concerning the safety

of the Charcoal Toothpaste was not met. For example, rather than safely whitening her teeth,

the Charcoal Toothpaste was actually abrading her enamel, and is not safe for use.

105.    Ms. Housey has standing to assert claims on all of the at-issue Charcoal

Toothpastes, because the products are nearly identical, and P&G's claims, omissions, and

conduct as to her product are substantially similar as to the other Charcoal Toothpastes

described in this Complaint, as are the injuries suffered by others as a result of the deceptive

labeling and advertising.

106.    Plaintiff suffered the out-of-pocket purchase price for a falsely advertised and

misbranded dentifrice(s). Her payment also reflects and included a price premium over other products by P&G that do not contain charcoal. The Charcoal Toothpaste purchased by Plaintiff did not and could not deliver the promised whitening benefits and lacked the represented level of safety, and use of the Charcoal Toothpaste poses some risk and is potentially detrimental to oral health and aesthetics.

## **CLASS ACTION ALLEGATIONS**

107. Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully set forth herein.

108. Plaintiff brings this action individually and on behalf of all other persons similarly situated pursuant to CAFA and Federal Rule of Civil Procedure 23. The class definition(s) may depend on the information obtained throughout discovery. Notwithstanding, at this time, Plaintiff brings this action and seeks certification of the following proposed Classes:

> **National Class:** All persons or entities within the United States who purchased one or more of P&G's Charcoal Toothpastes[46] for personal use from the beginning of any applicable limitations period through the date of preliminary approval (the "National Class" or the "Class").

> **Consumer Fraud Multi-State Class:** All persons or entities in the States of California, Florida, Illinois, Massachusetts, Michigan, Minnesota, Missouri, New Hampshire, New Jersey, New York, Rhode Island, Washington and Wisconsin who purchased one or more of P&G's Charcoal Toothpastes for personal use from the beginning of any applicable limitations period through the date of preliminary approval (the "Consumer Fraud Multi-State Class").

> **New York Sub-Class:** All persons or entities in New York who purchased one or more of P&G's Charcoal Toothpastes for personal use from the beginning of any applicable limitations period through the date of preliminary approval (the "New York Sub-Class").

---

[46] As previously defined herein.

109.    Excluded from the proposed Classes is the Defendant, and any entities in which the Defendant has a controlling interest, any Judge to whom this action is assigned and any member of such Judge's staff and immediate family, and Plaintiff's counsel, their staff members, and their immediate family.

110.    Plaintiff reserves the right to amend the Class definitions or add a Class if discovery and/or further investigation reveal that the Class definitions should be narrowed, expanded or otherwise modified.

111.    Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of its claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

112.    **Numerosity – Federal Rule of Civil Procedure 23(a)(a)**: The members of the Classes are so numerous that their individual joinder herein is impracticable. On information and belief, members of the Classes number in the thousands to hundreds of thousands. The number of members of the Classes is presently unknown to Plaintiff but may be ascertained from Defendant's books and records.  Members of the Classes may be notified of the pendency of this action by mail, email, Internet postings, and/or publication.

113.    **Commonality and Predominance – Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3)**: Common questions of law and fact exist as to all members of each of the Classes. and predominate over questions affecting only individual members of the Classes. Such common questions of law or fact include, but are not limited to, the following:

a.    Whether, in their product packaging, labeling, marketing, advertising, and/or sale of the Charcoal Toothpastes, Defendant made materially misleading representations and material omissions;

b. Whether P&G's false and misleading statements concerning the Charcoal Toothpastes and its concealment of material facts concerning the Charcoal Toothpastes were likely to deceive reasonable consumers;

c. Whether misrepresentations on the Charcoal Toothpastes caused consumers to pay a higher price than they otherwise would;

d. Whether the acts and omissions of Defendant violated Section 349 or 350 of the New York General Business Law;

e. Whether Plaintiff and the Classes are entitled to injunctive relief;

f. Whether Defendant was unjustly enriched by the sale of the Charcoal Toothpastes and the profits earned therefrom should be disgorged; and

g. Whether the actions of Defendant warrant punitive damages.

114.    Defendant engaged in a common course of conduct giving rise to the legal rights Plaintiff seeks to enforce, on behalf of herself and the other Members of the proposed Classes. Similar or identical statutory and common law violations, business practices, and injuries are involved. Individual questions, if any, pale in comparison, in both quality and quantity, to the numerous common questions that dominate this action.

115.    **Typicality – Federal Rule of Civil Procedure 23(a)(3)**. Plaintiff's claims are typical of the claims of the other Members of the Classes because, among other things, all Members of the Classes were comparably injured through Defendant's uniform misconduct described above. Further, there are no defenses available to Defendant that is unique to Plaintiff or to any particular Members of the Classes.

116.    **Adequacy of Representation – Federal Rule of Civil Procedure 23(a)(4).**: Plaintiff is an adequate Class representative because her interests do not conflict with the interests of the other Members of the Classes she seeks to represent; she has retained counsel competent and experienced in complex class action litigation; and she will prosecute this action

vigorously. The Classes' interests will be fairly and adequately protected by Plaintiff and the undersigned counsel.

117.    **Insufficiency of Separate Actions – Federal Rule of Civil Procedure 23(b)(1).** Absent a representative class action, Members of the Classes would continue to suffer the harm described herein, for which they would have no remedy.  Even if separate actions could be brought by individual consumers, the resulting multiplicity of lawsuits would cause undue burden and expense for both the Court and the litigants, as well as create a risk of inconsistent rulings and adjudications that might be dispositive of the interests of similarly situated purchasers, substantially impeding their ability to protect their interests, while establishing incompatible standards of conduct for Defendant. The proposed Classes thus satisfy the requirements of Fed. R. Civ. P. 23(b)(1).

118.    **Declaratory and Injunctive Relief – Federal Rule of Civil Procedure 23(b)(2).** Defendant has acted or refused to act on grounds generally applicable to Plaintiff and the other Members of the Classes, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to the members of the Classes as a whole. In particular, Plaintiff seeks to certify a Class to enjoin Defendant from selling or otherwise distributing the Products as labeled until such time that Defendant can demonstrate to the Court's satisfaction that the Products confer the advertised health or medicinal benefits.

119.    **Superiority – Federal Rule of Civil Procedure 23(b)(3).** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiff and the other Members of the Classes are relatively small compared to the burden and expense that would be required to

individually litigate their claims against Defendant, so it would be impracticable for Members

of the Classes to individually seek redress for Defendant's wrongful conduct.  Even if Members

of the Classes could afford individual litigation, the court system could not.  Individualized

litigation would create a potential for inconsistent or contradictory judgments and increase the

delay and expense to all parties and the court system.  By contrast, the class action device

presents far fewer management difficulties, and provides the benefits of single adjudication,

economy of scale, and comprehensive supervision by a single court.

### CAUSES OF ACTION

### COUNT ONE
**Violation of the State Consumer Fraud Acts**
**(On Behalf of the Consumer Fraud Multi-State Class)**

120.    Plaintiff incorporates by reference all of the foregoing paragraphs of this

Complaint as if fully set forth herein.

121.    The Consumer Fraud Acts of the States in the Consumer Fraud Multi-State

Class prohibit the use of unfair or deceptive business practices in the conduct of trade or

commerce.

122.    Plaintiff and the other Members of the Consumer Fraud Multi-State Class have

standing to pursue a cause of action for violation of the Consumer Fraud Acts of the States in

the Consumer Fraud Multi-State Class because Plaintiff and Members of the Consumer Fraud

Multi-State Class have suffered an injury in fact and lost money as a result of Defendant's

actions set forth herein.

123.    Defendant engaged in unfair and/or deceptive conduct by, *inter alia*, making

misrepresentations that the P&G's Charcoal Toothpastes had enamel-safe whitening properties,

they promoted healthier gums, and could gently clean.

28

124.   Defendant intended that Plaintiff and each of the other Members of the Consumer Fraud Multi-State Class would rely upon its unfair and deceptive conduct and a reasonable consumer would in face be misled by this deceptive conduct described above.

125.   Each of the Members of the Consumer Fraud Multi-State Class relied upon Defendant's unfair and deceptive conduct alleged herein in purchasing the P&G Charcoal Toothpastes.

126.   As a result of Defendant's use or employment of unfair or deceptive acts or business practices, Plaintiff and each of the other Members of the Consumer Fraud Multi-State Class have sustained damagers in an amount to be proven at trial.

127.   In addition, Defendant's conduct showed malice, motive, and the reckless disregard of the truth such that an award of punitive damages is appropriate.

### COUNT TWO
**Violation of the New York Deceptive Trade Practices Act,
New York Gen. Bus. Law § 349, *et seq.*
(In the Alternative to Count I and on behalf of the New York Sub-Class)**

128.   Plaintiff incorporates by reference all of the foregoing paragraphs of this Complaint as if fully stated herein.

129.   By reason of the acts set forth above, Defendant has been and is engaged in deceptive acts or practices in the conduct of a business, trade, or commerce in violation of New York's General Business Law § 349.

130.   Defendant engaged in unfair and/or deceptive conduct by, *inter alia*, making the representations that the Crest Charcoal Toothpastes can safely whiten teeth.

131.   The public is likely to be damaged because of Defendant's deceptive trade practices or acts. Specifically, Defendant's false, deceptive, or misleading statements implicate the health and safety of those consumers deceived by Defendant.

132.    Defendant directs its conduct at consumers, as Defendant's false, deceptive, or misleading statements are contained in marketing targeted toward consumers, including social media and retail product packaging. As such, Defendant's conduct as alleged herein is consumer oriented.

133.    Defendant's deceptive acts are likely to mislead a reasonable consumer acting reasonably under the circumstances.

134.    Defendant's deceptive acts affect the public interest in the state of New York because, upon information and belief, consumers located in New York have purchased Defendant's Products in reliance on Defendant's false, deceptive, or misleading statements.

135.    As a result of Defendant's use of employment of unfair or deceptive acts or business practices, Plaintiff and each of the other Members of the New York Sub-Class have sustained damages in an amount to be proven at trial.

## <u>COUNT THREE</u>
**Violation of the New York Deceptive Trade Practice Act,
New York Gen. Bus. Law § 350, *et seq.*
(In the Alternative to Count I and on behalf of the New York Sub-Class)**

136.    Plaintiff incorporates by reference all of the foregoing paragraphs of this Complaint as if fully stated herein.

137.    Defendant has made material, false or misleading statements or representations of fact about the Products. Specifically, Defendant has literally, impliedly, or by necessary implication made the representations that P&G Charcoal Toothpastes had safe whitening properties, which is not true.

138.    Defendant's acts constitute false advertising in the conduct of business, trade, or commerce, or in the furnishing of any service in the state of New York in violation of New York's General Business Law § 350.

139.    The public is likely to be damaged because of Defendant's deceptive trade practices or acts. Specifically, Defendant's false or misleading statements implicate the health and safety of those consumers deceived by Defendant.

140.    As such, Defendant's conduct as alleged herein is consumer oriented.

141.    As a result of Defendant's material, false or misleading statements or representations of fact about the Products, Plaintiff and each of the other Members of the New York Sub-Class have sustained damages in an amount to be proven at trial.

## COUNT FOUR
### Fraud
**(On Behalf of the Nationwide and/or Multi-State Class and/or the New York Sub-Class)**

142.    Plaintiff incorporates by reference all of the foregoing paragraphs of this Complaint as if fully stated herein.

143.    Plaintiff brings this cause of action on behalf of herself, the Nationwide Class and/or Multi-State Class and/or the New York Sub-Class against Defendant.

144.    As alleged herein, P&G knowingly made material misrepresentations and omissions regarding the Charcoal Toothpastes on the Charcoal Toothpastes' labeling and packaging in the Charcoal Toothpastes' advertisements, and/or on its website.

145.    P&G made these material misrepresentations and omissions in order to induce Plaintiff and putative Class Members to purchase the Charcoal Toothpastes.

146.    P&G did not inform consumers that the Charcoal Toothpastes do not have "enamel safe whitening" properties, cannot promote "healthier gums", and cannot "gently clean"; instead, P&G claims in marketing materials, as well as its marketing campaign for the Charcoal Toothpastes, suggests that the Charcoal Toothpastes are capable of enamel-safe teeth whitening, promoting healthier gums, and can gently clean, in order to mislead consumers that

the Products have those attributes.

147.     Defendant knew the Charcoal Toothpastes were not capable of "enamel safe" whitening, promoting healthier gums, and gently cleaning, but nevertheless P&G made such representations through the marketing, advertising, and on the Charcoal Toothpastes' labeling. In reliance on these and other similar misrepresentations, Plaintiff and putative Class Members were induced to, and did, pay monies to purchase the Charcoal Toothpastes.

148.     Had Plaintiff and the Class known the truth about the Charcoal Toothpastes, they would not have purchased the Charcoal Toothpastes.

149.     As a proximate result of the fraudulent conduct of Defendant, Plaintiff and the putative Class paid monies to Defendant, through its regular retail sales channels, to which Defendant is not entitled, and have been damaged in an amount to be proven at trial.

<u>**COUNT FIFTH**</u>
**Unjust Enrichment**
**(On Behalf of the Nationwide Class and/or Multi-State Class and/or New York Subclass)**

150.     Plaintiff incorporates by reference all of the foregoing paragraphs of this Complaint as if fully stated herein.

151.     Plaintiff brings this claim against Defendant on behalf of herself and the New York Sub-Class.

152.     Plaintiff and the other Members of the New York Sub-Class conferred benefits on Defendant by purchasing the Charcoal Toothpastes.

153.     Defendant received the benefits to the detriment of Plaintiff and the other Members of the New York Sub-Class because Plaintiff and the other Members of the New York Sub-Class purchased mislabeled Charcoal Toothpastes that are not what they bargained for and that did not provide any of the promised benefits.

154.    Defendant has been unjustly enriched in retaining the revenues derived from the purchases of the Charcoal Toothpastes by Plaintiff and the other Members of the New York Sub-Class. Retention of those monies under these circumstances is unjust and inequitable because Defendant's labeling of the Charcoal Toothpastes was misleading to consumers, which caused injuries to Plaintiff and the other Members of the New York Sub-Class, because they would have not purchased the Charcoal Toothpastes had they known the true facts.

155.    Because Defendant's retention of the non-gratuitous benefits conferred on them by Plaintiff and the other Members of the New York Sub-Class is unjust and inequitable, Defendant must pay restitution to Plaintiff and the other Members of the New York Sub-Class for their unjust enrichment, as ordered by the Court.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all other similarly situated members of the Class(es), pray for relief and judgment, including entry of an order, as follows:

(a) Declaring that this action is properly maintained as a class action, certifying the proposed Class(es), appointing Plaintiff as Class Representative and appointing Plaintiff's counsel as Class Counsel;

(b) Directing that Defendant bear the costs of any notice sent to the Class(es);

(c) Declaring that Defendant must disgorge, for the benefit of the Class(es), all or part of the ill-gotten profits they received from the sale of the Products, or order Defendant to make full restitution to Plaintiff and the members of the Class(es);

(d) Awarding restitution and other appropriate equitable relief;

(e) Issuing an injunction against Defendant to enjoin it from conducting its business

through the unlawful, unfair, and fraudulent acts or practices set forth herein;

(f) A jury trial and damages according to proof;

(g) Awarding Plaintiff and members of the Class(es) statutory damages, as provided by the applicable state consumer protection statutes invoked above;

(h) Awarding attorneys' fees and litigation costs to Plaintiff and members of the Class(es);

(i) Civil penalties, prejudgment interest and punitive damages as permitted by law; and

(j) Ordering such other and further relief as the Court deems just and proper.

## **JURY TRIAL DEMAND**

Plaintiff hereby demands a jury trial of the claims asserted in this Complaint.

Dated: March 16, 2021                                    Respectfully submitted,

*/s/ Jonathan Shub*
Jonathan Shub
Kevin Laukaitis*
**SHUB LAW FIRM LLC**
134 Kings Highway East, 2nd Floor
Haddonfield, NJ 08033
Tel: (856) 772-7200
Fax: (856) 210-9088
jshub@shublawyers.com
klaukaitis@shublawyers.com

Michael R. Reese
**REESE LLP**
100 West 93rd Street, 16th Floor
New York, New York 10025
Telephone: (212) 643-0500
Fax: (212) 253-4272
mreese@reesellp.com

*Pro Hac Vice Forthcoming*

*Attorneys for Plaintiff and the
Proposed Class*